Roll v. Raguet.

---

*PETER ROLL v. HENRY RAGUET. [400

An action can not be sustained upon a promissory note, the sole consideration of which is an agreement on the part of the payee not to prosecute the maker for felony.

ERROR to the court of common pleas of Hamilton county.

Henry Raguet brought a suit in the court below, against Peter Roll and Charles Roll, upon a promissory note for the sum of five hundred dollars. Charles Roll was returned by the sheriff, not found, and the declaration was filed against Peter Roll, in the common form of the payee against the maker.

The defendant, besides the general issue, pleaded in bar, that before, and at the time said note was given, Charles Roll, who was the son of the plaintiff in error, was suspected and accused by Raguet of having feloniously taken his money, goods, and chattels, in Cincinnati; that Raguet was about to institute a criminal prosecution against Charles Roll, and cause a judicial investigation to be made touching said supposed felony, and threatened Charles and Peter Roll that, unless they would pay him five hundred dol-

lars, he would subject Charles Roll to undergo an examination before some judicial tribunal for said supposed offense, and would endeavor to cause Charles Roll to be indicted and sent to the penitentiary for the same; but at the same time promised and agreed with Charles Roll and Peter Roll, that if they would pay him five hundred dollars he would altogether desist from instituting any criminal prosecution against Charles Roll, nor would he appear before any judicial tribunal to give evidence against him for said supposed offense; but would endeavor to suppress any investigation concerning the same. That, in order to prevent a criminal prosecution against Charles Roll, and to save him from any indictment and punishment, and in consideration of said agreement on the part of Raguet, he, Peter Roll, made and delivered to Raguet the note in the declaration mentioned.

To this plea there was a general demurrer and joinder. The 401] court below sustained the demurrer and gave judgment *in favor of the defendant in error; to reverse which this writ of error was prosecuted, and the common error assigned.

CASWELL & STARR, for the plaintiff in error:

The only question for the investigation of the court is, whether the consideration of the note, as set forth in the plea, makes the note *void*, and the plea sufficient. We contend that it does; and we think the position can be most amply sustained by authority and principle.

The two following propositions are laid down in all of the books, and if they are true, they must make an end of the case:

1. All contracts, agreements, or promises, whose consideration is illegal, contrary to sound policy and good morals, are *void*.

Starkie, in his treatise on the law of evidence, says, in the words of our proposition, that, "if the consideration be illegal, or contrary to justice and sound policy, no action can be founded upon it." The maxim is invariable, that "*ex turpi causa non oritur actio.*" 2 Stark. 87.

"Courts will not lend their aid to enforce a contract where the consideration is illegal or immoral." 7 Term, 601. Hence, contracts in consideration of *prostitution*, or whose effect is the encouragement of prostitution, have been holden to be *void*, because contrary to good morals. 1 Swift, 210; Cowp. 29. So, also, it has been holden that all contracts contrary to sound policy are void.

Roll *v.* Raguet.

Such, for instance, as where a mechanic or physician should agree not to exercise their several professions, for a sum of money; for these contracts are injurious to the public welfare. 1 Swift, 218; 1 P. Wms. 181.

If these authorities sustain our proposition, and if that be true, an executory contract, like that under consideration, must be void. It is surely as immoral for a man to bind himself to *conceal a crime*, as to suppress the evidence of guilt; and to enforce such an agreement is as much opposed to good policy as to contract for the purpose of *prostitution*, or to discontinue a valuable trade or profession.

*Every man is morally and legally bound to take notice of [402 all violations of criminal law, and to take all proper steps to procure the conviction of the offense; or, at any rate, not to throw obstacles in the way of it. To take a *bribe*, or *the promise of one*, as " *hush money*," is surely highly immoral; and no contract to pay such bribe, or hush money, ought to be sanctioned by a court of law. These views are fully sustained by all writers on the subject of contracts, and by all courts, both in England and America, have been holden to be fundamental principles of jurisprudence.

Pothier, in his elaborate treatise on obligations, observes: " Whenever an engagement is entered into, with a view to contravene the *general policy* of the law, no form of expression can remove the *inherent defect* in the nature of the transaction. The law will investigate the real object of the contracting parties, and, if that is repugnant to the principles established for the general benefit of society, it will vitiate the most regular instrument which ingenuity can contrive." 2 Poth. Obl. 12; 2 Kent's Com. 366.

It was decided by the court of common pleas, in Parsons *v.* Thompson, that a promise by a person to pay a sum of money to another, in consideration that the latter would resign a public office which he held, and if the former should be appointed to succeed him, was *void*. Such a contract, said Lord Loughborough, is not the proper subject of an action. 1 Hen. Black. 322.

Lord Mansfield, in deciding a case similar in principle to the present, says: " The objection that a contract is immoral and illegal, sounds very ill from the mouth of a defendant; and it is not for *his sake* that the objection is allowed. But still, to permit such a defense, is *politic*." . . . " No court will lend its aid to a

plaintiff who founds his action on an illegal or immoral act. If it appears to the court that the action arose *ex turpi causa*, they will say he has no right to ask their aid. It is upon this ground the court proceeds, and not for the sake of the defendant. Holman *v.* Johnson, Cowp. 341.

Pothier, in another part of his treatise, remarks, that, "Every transaction, the object of which is the violation of public or private duty, is void. A promise of a bribe to a *public officer, agreement to stifle a prosecution for any crime of public nature," etc. 2 Treatise on Oblig. 4.

Powell, also, in his treatise on the law of contracts, says: "All contracts having a fraudulent design in view are void, both in law and in equity." Pow. on Con. 185.

Again, he says: "A contract is unlawful, in a proper sense, if the object of it be to induce the omission of something in a person, the doing of which is a duty in the person with whom it is made." Id. 195.

So also of a contract to encourage a criminal act, as if a man bet with another he will seduce a certain woman. Id. 196.

Judge Story's pleadings contain the form of a plea similar to the one now under consideration, which he says was solemnly argued on demurrer, and sustained, taken from 7 Wentworth. Story on Plead. 125.

And the Supreme Court of New York, in an action brought on a promise made by an insolvent debtor, applying for the "benefit of the act," to one of his creditors, in consideration that he would not oppose the debtor's application, after deciding the promise to be void, says: "The promise was *illegal*. It was founded in fraud, and made for the purpose of stifling due scrutiny into the claim of the defendant to a discharge under the insolvent law." 2 Johns. 386.

In a similar case the same court says: "The consideration for the bond was illegal, and against the true interest and policy of the insolvent act." 4 Johns. 410.

Comyn, in his treatise on contracts, lays down the same principles very explicitly. He says: "All contracts or agreements, which have for their object anything which is repugnant to justice, or against the general policy of the common law, or contrary to the provisions of any statute, are void. The common law prohibits everything which is unjust, or '*contra bonos mores*.' Therefore a

Roll *v.* Raguet.

contract or agreement which is made in contravention of these general principles, is void." Com. Con. 29, 30.

On comparing these principles with the case presented in our plea, it seems impossible to restrain the conviction that they fully support its sufficiency. The plea asserts that the consideration of the note was the suppression of a felony, *and if that be [404 not illegal, immoral, or contrary to the policy of the law, we know not what is. We have shown that a promise by an insolvent debtor, in consideration of the silence of his creditor, on his application for a discharge from his debts, was illegal, because tending to the injury of the public. Can anything be more injurious to the public weal than a promise to conceal the evidence of crime?

Felonies of every description, almost, are punished by the courts of Ohio. It is of infinite importance that every citizen should feel the force of the obligation resting on him to aid in bringing felons to justice. Surely, then, this court will not say that it is not immoral, impolitic, and improper in the highest decree, for a citizen to sell his silence on every occasion where he may have been so fortunate as to have been a speculator on the commission of a felony, or lend its aid in enforcing payment of the price of such silence.

But to sustain his plea, the defendant need not rely upon the broad principle of the immorality of the consideration of the note, or of its being so much opposed to the policy of our criminal code.

There is still another general principle of law, founded perhaps upon the principles already laid down, which bears directly upon the issue, and fully sustains the sufficiency of our plea, viz:

2. That all contracts made to prevent the due course of justice, are void.

This principle, if it can be established, settles the question, and no proposition is more capable of being supported by high authority. To stipulate to conceal the evidence of guilt, conflicts immediately with the course of equal and exact justice. If this be not true, then there can be no punishment for crime, unless it chance to be associated with poverty. Whenever there is ability to purchase silence, silence will be bought, and courts will countenance such bargains and lend their aid to enforce them. But they have never yet done so, as an examination of a great many cases will abundantly show.

The promise of Raguet was to conceal the evidence of a felony from the officers of justice, and for this, Roll promised *to [405

pay him five hundred dollars. This was clearly "compounding a felony," and there is no principle of law better settled than that such a contract is wholly invalid, binding on neither party, and at the common law, was of itself a high crime and misdemeanor.

Blackstone says, that "formerly it was holden to make a man an accessory, but is now only punished with fine and imprisonment. By the ancient Gothic institutions it was liable to the most severe and infamous punishment. 4 Black. Com. 133."

And the Latin law, "*latronirum similam habuit, qui furtum celare vellet, et acculte sine judice compositionem ejus admittere.*" Stiernhde Jur. Goth., c. 3, 5.

We need not resort to analogy to support this doctrine. Our reports, ancient and modern, abound with cases in which it is recognized. On the authority of a very ancient case in 1 Leonard, Swift, Comzar, Pothier, and Powell all say, "that if A. promise B. money in consideration that B. shall not give evidence in a certain case, such contract shall not be enforced, for it is unlawful and iniquitous for a man to suppress testimony."

The case of Collins and Blantern was an action on a bond to pay money in consideration of suppressing a prosecution for perjury, and the question arose on a demurrer to a plea similar to the one now before the court. Wilson, 341.

In giving the opinion of the court, overruling the demurrer, Chief Justice Wilmot uses this emphatic language: "The manner of the transaction was to gild over and to conceal the truth, and whenever courts of law see such attempts to conceal such wicked deeds, they will brush away the cobweb varnish and show the transaction in its real colors. This is an agreement to stifle a prosecution for willful and corrupt perjury, a crime most detrimental to the commonwealth, for it is the duty of every man to prosecute and bring to justice all offenders of this sort. This is a contract to tempt a man to transgress the law and to do that which is injurious to the community. It is void by the common law, and the reason why the common law says such contracts are void, is for the public good. You shall not stipulate for iniquity. 406] *All writers agree in this, that no polluted hand shall touch the pure fountains of justice."

Swift, also, says, that, "all contracts made in consideration of compounding felonies, or crimes, are void." 1 Swift, 217.

Baily, in his treatise on bills, says: "Dropping a criminal

·prosecution or suppressing evidence thereon, is an illegal consideration." Baily on Bills, 357.

In Swelt v. Poor, which was an action brought on a contract of maintenance, the court say, "no principal is more clear than that a man can not build up a right on an illegal or immoral act of his own." 11 M. T. 564.

So in Worcester v. Eaton, where the consideration of a deed was the concealment of a theft and an agreement not to prosecute, the ·same court hold a similar doctrine, and recognize all the principles we have laid down. Id. 368.

In Johnson v. Ogilbie, the chancellor said that a bill in equity would not lie to compel the performance of an agreement to pay money in consideration of having stifled a prosecution of felony. 2 P. Wms. 277.

Chancellor Kent, in his learned lectures, adopts all of the principles for which we contend. 2 Kent, 366.

The courts of South Carolina have·adjudged a case precisely in point. In Bell v. Woods, they say : " A note given to compound a felony is void at law, as well as in the hands of an innocent indorsee, as of the payee." 1 Bay, 249.

These authorities ought to put this question to rest. It seems from them that the positions we have taken are no novelties. Contracts of this kind, doubtless, are as old as crime itself ; and if we can judge from the institutions of ancient nations, they have ever been considered violations of moral duty, opposed to the best interests of social communities, and wholly invalid and void, binding neither one party nor the other. Suppose the situation of these parties was reversed ; that Raguet, notwithstanding his promise, had procured Charles Roll to be indicted, and an action had been brought by the Rolls, to recover damages against Raguet, would this court have scouted at such a suit ? It would, in our opinion, have been a contempt of court in the *at- [407 torney who would bring such a suit. It would be almost as strange a case as that of Everett and Williams, which was a bill in chancery by one highway robber against his partner, to compel an account of the profits of their busines. In that case the court decided the bill *scandalous and impertinent,* and the solicitors who filed it, attached and fined. In what respect, we would ask, upon principle, are these cases different, and in what is Raguet's merit greater than that of the robber, who filed his bill on a partnership

contract to rob and plunder on the highway, or than Roll's would have been, had they sued Raguet for a violation of his agreement? The difference in the cases is only this, that it is a less crime to conceal a felony than to commit it, a difference which, perhaps, may save him from an attachment for contempt of court, but adds nothing to the merit of his cause, or to the validity of his contract.

It is a self-evident truth, that no government, where the governed have rights, can exist long, if contracts like that between Raguet and Roll are respected by courts of law. No government can enforce its laws, if they sanction, in any shape, the doings of swindlers, cheats, or felons. Fraud, crime, and force taint everything with which they come in contact. And every contract, or agreement, tinged with the slightest shade of either, becomes an object too offensive for the eye of justice to endure. No other rule will protect the honest and moral part of mankind from the arts and violence of the wicked and corrupt. And upon these principles, courts have ever sat in judgment upon contracts of this description, as a host of authorities will show. Courts have said:

That contracts against the provisions of statutes: 4 Bun. 2225; 5 Term, 723; B. & P. 272, 551; Carth. 252; 1 Nott & McC. 211, 178; 2 Bay, 260.

Contracts, where the consideration is the commission of some crime: 17 Johns. 142; 1 Viner, 299; Bull. N. P. 146; 3 Bun. 1568.

Contracts, where the consideration is an undertaking to defame government, or persons: 3 Term, 551; 2 Term, 763; 4 Term, 166; 6 Term, 143; 1 Chan. 87; Doug. 450; 4 East, 372.

408]  *Contracts to oppress third persons, or founded in oppression: 2 Bun. 925; 9 East, 416.

Contracts to induce a violation of public duty: Cro. Eliz. 230, 199; 2 Car. Law, 66.

Contracts tending to encourage unlawful acts: 3 Marsh. 433; 2 Bibb, 453.

And contracts growing out of trading with an enemy, in time of war, *are void.* 1 Pow. 191; Bull. N. P. 146.

The decisions in these cases have been made upon the principle, that to give effect to such contracts, impairs the benevolent operations of all laws, and furnishes a strong temptation to crime and fraud. And they show, too, that no cover however ingeniously put on, will avail, to prevent courts of justice from de-

tecting the real motive of such proceedings. 17 Mass. 258; 2 Kent's Com. 366; 2 Peters, 529.

It may be urged here, as it was in the court below that the gen-eral principles we have laid down, on the subject of compounding felonies, apply to those cases only where prosecutions had actually been commenced. An examination of some of the cases which we have cited, shows that there is no merit in the distinction; and it is self-evident, that a rule so restrictive would furnish but a feeble protection to the property and persons of the honest and poor. 11 Mass. 368; 9 East, 49; 1 Bay, 249.

Nor is there any merit in the distinction, that there is not in this state any statute making it *criminal* to compound felonies Burnet's opinion in Key *v.* Vattier, 1 Ohio, 144.

It is enough, that it is highly immoral and impolitic to make such an agreement. And we think that we have shown, that contracts of this kind are *contra bonos mores,* and to the general policy of our criminal laws.

Suppose, in this case, that Mr. Roll, the plaintiff in error, had gone to Mr. Raguet, and said to him, somewhat in this way : " I am told, my son has stolen your property, and that you mean to prose-cute him. I am unwilling he should be exposed and punished. Now, if you will say nothing about it, and desist from all attempts at prosecution, I will give you my note for five hundred dollars." The proposition is made and accepted. (The precise case presented by the pleadings *in this suit.) Suppose, again, that an in- [409 dictment had actually been found, and the trial about to come on, and Mr. Roll, apprehending that Mr. Raguet might appear as a witness against his son, had gone to him and said : " If you will not give evidence against my son, but will withdraw out of the juris-diction of the court, so that you can not be summoned as a wit-ness on the trial of the indictment, I will give you my note for five hundred dollars." The last proposition is made and accepted. Will it be said that any court would lend its aid to enforce a col-lection of the note in the one case, and not in the other, merely because an indictment had not been found; or that the guilt or in-nocence of the suspected son could make any difference, as to the principle of law applicable to the case? Or, that the father would be subjected to the payment of the notes, if his son was guilty, or exempt from their judgment, if innocent? In both cases, it would be an agreement, on the part of Raguet, to sell his silence; to

373

take hush-money; to receive a compensation not to tell; to take a reward; indeed, to suppress evidence, touching a criminal offense. And can notes, given for such purpose, be valid and effectual in law?

The distinction attempted to be set up, is a fanciful one. It is a distinction without a difference in principle. It is unworthy an enlightened administration of justice, and receives no countenance from the books. We therefore think, that there was manifest error in the judgment of the court below, sustaining the demurrer to our plea.

In the above argument, the case of Key *v.* Vattier ought to have been cited, as settling all the principles for which we contend. Judge Burnet's opinion is conclusive on all the points we have made.

STORER, contra:

The plaintiff in error contends that the demurrer to his plea in bar, should have been overruled in the court below, and that the court erred in sustaining the same.

*First.* Because the matters pleaded, show that a prosecution for felony was compounded.

410]    *In order to apply the doctrines of the common law, and the adjudications under the English statutes, to the present case, it will be necessary to examine the reasons on which those doctrines are founded, and to investigate the causes which produced the enactment of those statutes.

Anciently, every felony was punished with death. The tenant followed his lord into the field, and as there was no provision made for his support, he was compelled to bring into the camp his own food, as well as his weapons; hence a most rigid and severe administration of justice was induced by necessity.

To protect the property of the vassal from injury, and to prevent a resort to force in its defense, the punishment of death, in a most summary manner, was instituted. As society advanced in civilization, it was deemed impolitic to dispense at once with the severity of the ancient law, and, although the reason of the old rule had ceased, still, it was adhered to in a great variety of instances. The person attainted, or convicted of felony, as he had deprived his lord of his services, by the forfeiture of his body to the king, his blood became corrupted; he consequently died without heirs, and the lord became entitled to all the vassal's property

Roll v. Raguet.

by escheat. The same held as to chattels. This principle, when the relation of lord and vassal ceased, was extended to embrace the relation of king and subject, and the same consequences attached.

So rigidly was it enforced, that the forfeiture related back to the time of the offense, and avoided all intermediate alienation. 3 Bacon's Abr., title Felony, 128, and title Forfeiture, 271.

By the felonious act, then, it is found that the body and goods of the offender became forfeited to the government, and all individual control over either one or the other, on the part of the offender, was at an end.

Every act of the criminal, that prevented an inquiry into his case, was deemed a fraud upon the king; and it is said, that Lord Holt once held that a bill of sale was fraudulent as to the king, because the vendor was in Newgate, and had disposed of the goods to his son. So perfect was the forfeiture of the goods by the felon, that it was held no *action would lie, by the owner of the [411 property stolen, to recover it. Hence the statute, 21 H. VIII., c. 11, was enacted, by which restitution of the goods stolen is adjudged to the true owner.

Subsequent to the passing of this act, it was held that where an appeal of robbery was brought, *trover* would not lie against the felon for the goods stolen, because the taking shall be adjudged felonious, and not merely a conversion. 6 Bac. Abr. 689, title Trover. And in latter times the English courts have held the rule thus laid down to be in full force.

In Gibson et al. v. Minet et al., 1 Blk. 569, it is said "that it is against the policy of the law to permit a party who has suffered by the crime of another to seek a remedy by a civil action." And in Master v. Miller, 4 Term, 320, Buller, Judge, says, "That where a case amounts to felony, you shall not recover against the felon in a civil action." Now the true reason for these decisions may be traced to the statute of Henry VIII., to which I have just referred.

Where the law gives restitution by the same act which convicts the offender, there is no necessity for a private action. And the pending of a civil suit, under these circumstances, might produce an unfavorable effect upon the proceedings against the criminal on the part of the commonwealth.

Previous to the passage of the act alluded to, the least in-

terference on the part of third persons with the felon, nay, even
the passive silence of any one who knew of the existence of a
crime, were held to be misprisions. It is matter of curious in-
quiry to look into some of the cases where legal subtlety, in an age
of absurd legal technicality, transformed acts, indifferent in them-
selves, into offenses. "It was held silently to observe the com-
mission of a felony, without using any endeavors to apprehend the
offender, is a misprision." 1 Hawk. P. C. 659, s. 2. "A man is
bound to discover the crime of another to a magistrate with all
possible expedition." 1 Hale P. C. 372. In this chapter Sir Mat-
thew Hale remarks, "That by the old law, in Bracton's time, if a
man knew of a treason he was bound to reveal it to the king, or
412] some of his council, within two *days, but at this time it is
misprision if he reveals it not as soon as he can to some judge of
the assize."

The statute of Westminster, 3 Ewd. I. Eg. is the first act upon
the subject of misprision of felonies; this is confined to public of-
fenses.

By the 3 H. VII., c. 1, the second statute that was passed, power
was given to the justices of every shire to hold inquests to
discover all concealments of felonies, and to punish accordingly.

From misprisions we proceed to another species of offenses,
which was anciently denominated *theft bote*, but is now termed
compounding a felony, which is, when the party robbed not only
knows of the felon, but also takes his goods again, or other
amends, upon agreement not to prosecute. 1 Hawk. P. C., c. 59,
s. 5. By the statute, 18 Eliz., c. 5, s. 4, it was made criminal to
compound any offense without the consent of the court.

By the statute, 4 Geo. I., c. 11, it is made felony to help a person
who has stolen goods; and by 25 Geo. I., c. 36, to advertise even a
reward for the return of the things stolen, the person incurs a for-
feiture of fifty pounds. From the short exposition I have thus
given, it appears clearly that the reasons on which the common
law principle is founded are peculiar to the age and government
where that law existed in its original rigor.

These reasons do not obtain in this country. It is equally ap-
parent, I conceive, that the English statutes have been enacted
either to mitigate the severity of the common law, in this respect,
or to sanction, by some legislative expression, the existence of the
ancient rule.

Whatever may be said as to the principle of public policy, it can not be urged that the common law or the statutes were founded upon it. They were both the result of arbitrary maxims, which became rules from necessity in the first place, and were afterward so interwoven into the system of criminal jurisprudence that it was found difficult to carry into effect the penal code of the kingdom, unless those principles were pertinaciously adhered to.

Notwithstanding the strictness with which these principles have been applied, their absurdity has been exposed, and their authority questioned by British judges.

*As in Buller's Nisi Prius, 131 : " In *assumpsit* for money re- [413 ceived to the plaintiff's use, proof that a lamb was driven to London and sold there by the defendant, will be sufficient unless it appear to be stolen, where *trover* would be the only proper action." And another is mentioned in Buller, " where a nurse ran off with a dead man's money, the administrator was permitted to bring an action for the amount."

In this country, the reason of the rule has ceased. Felony, or that species of it which it is alleged was attempted to be compounded in this suit, is followed by no forfeiture of life, limb, or estate.

The case of Boardman *v.* Gore et al., 15 Mass. 331, embraces much of the discussion on the point now before the court. Judge Parker observes, " that whatever may have been the reason in which the common-law doctrine was founded, it is plain that the reason has ceased with us. In the few cases of felony which are punished with death here, it may be that the principle is still in force, so far as that the felon may not be sued in a civil action until after acquitted or pardoned.

For if convicted, he will be executed, and as felonies include a trespass, the action dies with crime. But there seems to be no reason why the injured party may not have an action for his damages, where the wrong-doer is living, and has estate sufficient to compensate the wrong.

I assume this principle, then, that before a prosecution can be said to be compounded, there must have been one commenced. It is not alleged in the pleadings that one was pending, or that any proceedings of a criminal nature had been had.

All the authorities quoted by complainant's counsel proceeded on this principle. 1 Comyn on Contracts, 28, 30, 32. The text con-

tains the precise proposition I have presented, and the leading case of Collins *v.* Blanturn, 2 Will. 341, is quoted to sustain it. On examining this authority, it appears that an indictment had been found for perjury, and in consequence of receiving a bond for several hundred pounds, the plaintiff, who was a witness, agreed not to appear or prosecute. In a suit brought upon the bond, the 414] court very *properly decided that they would not lend their aid to enforce it.

The quotation from Powell, 93, is to the same point. 1 Swift, 237, like Bacon's Abridgment, embodies all the authorities referred to, with the addition of the judges' comments, but no one case is here to be found which conflicts with the principles I contend for.

In Johnson *v.* Ogilby, 3 P. Wms. 277, the chancellor expressly says, " This is a criminal prosecution, and the agreement is to stifle it;" and on referring to the reporter's account of the case, it appears an indictment had been prepared for a cheat, and just before the trial came on, it was compounded. Evans' Notes on Pothier, which are referred to by plaintiff's counsel, support the same position.

In Harding et al. *v.* Cooper, 1 Starkie's N. P. Cas., a prosecution had been commenced against the defendant for having fraudulently obtained his discharge as a bankrupt, and a bill of indictment was found. An agreement was made by defendant's father-in-law, to give his acceptance for two shillings sixpence upon the pound, and the prosecution was abandoned in consequence; and Lord Ellenborough expressly says, in giving his opinion " that it is an agreement to drop a prosecution, and is therefore illegal." In Waite *v.* Harper, 2 Johns. 386, defendant agreed to give a certain sum if plaintiff would not oppose his discharge under the insolvent law; the contract was held to be fraudulent, as tending to stifle a due scrutiny into the claim of defendant to his discharge.

Bruce *v.* Lee et al., 4 Johns. 110, proceeded on the same ground, that the agreement was to stifle a scrutiny into the bankrupt's claim to a discharge.

Thus far the plaintiff in error and his authorities. Our view of the law is this: It is perhaps the moral duty of every man to inform the proper authority of all offenses that he knows have been committed; but it is not his legal duty. The sin of omission is not a crime, however strong may be the claims of society upon the conscience. No man wishes to be a public prosecutor. The odium universally attached to such a profession would forbid any hon-

Roll *v.* Raguet.

orable man to embrace it. Until, then, some public act is performed by *which the right of the public, in the development of   [415 crime and the punishment of the criminal is clearly established— until an oath is made that an offense is committed, legally speaking—no prosecution is pending, and of course none can be "dropped" or "compounded." It is clear that the owner of goods which have been stolen, should he obtain his property from the thief, by the promise that he would not prosecute him, would still be entitled to. retain his property. It was his before the promise was made, and no subsequent act of his, or of the felon, could deprive him of his right.

Should, however, the felon be indicted, and the owner of the goods be the only prosecuting witness, his promise to the person would certainly prevent his testimony from being received, and the prisoner would be acquitted; still the prosecutor would have the goods.

On this principle, courts of equity have held that agreements between persons, the consideration of which was *past cohabitation,* are to be enforced. Johnson *v.* Ogilby, 3 P. Wms. 279; Annandale *v.* Harris, 2 P. Wms. 433.

*Second.* It is said, however, that the contract is void because it is against public policy. The public have an interest, I readily admit, in the reformation as well as the punishment of the guilty, and the example of public punishment is both proper and necessary.

But there is a stronger reason why a contract of the nature now excepted to should be supported than can be urged against the execution. Crime is rendered such, not unfrequently, by being made public. Reformation is, in almost any case, made hopeless by similar means. If, then, a young man who has defrauded his employer while a clerk, to a large amount, should be induced, when accused of the act, to do justice to the injured party, and, in a spirit of penitence, be willing to make amends, and to effect so desirable an object his father should join in the security, why does not public policy sanction such an agreement?

. Is it immoral; is it opposed to a full or perfect control of the criminal laws of the country over the subjects of these laws? Restitution is a moral duty. A moral obligation is always held to be a good consideration to support a contract. By our statutes defining and punishing crimes, no restitution *is ordered to  [416. be made on conviction. There is no judgment that the criminal shall pay to the injured party the value of the property purloined.

If the party injured had no right to receive back his goods before conviction, the doctrines of the Goths and Vandals, whose code is referred to in 3 Kent's Com., must prevail.

The property stolen vested in the government, and thus the authority that framed the law, by an act of moral turpitude on the part of any man, became accessory to his guilt.

The party injured may forbear to prosecute. He is not compelled to inform. How, then, can the state interpose and complain of a violation of her unwritten law in compounding prosecutions, as opposing good morals?

In the absence of all statutory provisions on the subject, the rules of the common law, so far as they are consistent with our institutions, must doubtless prevail. In the application of these rules to the present case, whether the defense sought to be sustained is such a one as ought to have been made, is to be gathered from all the facts stated in the plea. It is alleged, that the father consented to become security, to prevent his son from being sent to the penitentiary. This implies guilt. In cases somewhat similarly situated the usual averment is, that the prosecution, if there was any, was groundless, and the accusation without any foundation in truth. A bond given to a person injured by an assault and battery, to make satisfaction and to prevent prosecution, was held to be legal and valid. Price *v.* Summers, 2 South. (N. J.) 578.

We have no statute by which the concealment or compounding of offenses is punishable. Our legislature have not found it necessary to enact any law on the subject, and their silence is evidence that there was no necessity for their interference. Even in England the courts have exercised a discretion in permitting the parties to compound, and this, too, without the assistance of a statute. And in Ohio, a law was passed a few years since, that on complaint before a justice of the peace, for an "assault and battery," the parties might compound on the trial, and prevent any further prosecution.

417] *In Beeley *v.* Wingfield, 11 East, 56, a note was taken by the parish officers from the defendant, who was prosecuted for a misdemeanor; the amount of the note was forty-two pounds, and the consideration the expenses of the prosecution. The note was given on the intimation of one of the justices of the sessions, that the punishment would be proportionably lighter; and this note was held

Roll *v.* Raguet.

valid by the court of King's Bench, and a similar decision, in prin-ciple, is to be found in Baker *v.* Townsend, 8 Taunton, 424.

Can it, then, be contended that it is against public policy for the injured party to receive a security for the amount of the property he has lost, where no restitution is made by statute, and no remedy by law?

Is the unfortunate person who has lost his goods to permit what the defendant's counsel contend is public policy, to take from him all right to recover, all right to secure?

If he loses his chattels he can sue the finder, but if they are stolen the felon is protected, according to the construction of those opposed to us. We do not thus reproach the law with injustice.

Dr. Paley, in his chapter on promises, at page 93 of his Moral Philosophy, justly remarks, "It is the performance being unlawful, and not the unlawfulness in the subject or motive of the promise which destroys its validity; therefore, a bribe after the vote is given, the wages of prostitution, the reward of any crime after the crime is committed, ought, if promised, to be paid. For the sin and mischief of this supposition is over, and will be neither more nor less for the performance of the promise." And, again, "a promise can not be deemed unlawful where it produces, when performed, no effect beyond what would have taken place had the promise never been made."

The defense in this case is a disgraceful one to the plaintiff in error. To say nothing of the father's duty, not to question his motive, or suspect his integrity, we must be satisfied he has exposed the turpitude of his son, and wishes now to defend himself under his own consciousness that it is better for his child to become morally infamous than that the parent should expend part of his fortune to conceal his obliquity. No parallel case with the present can be found *in the books. Every case I have met with, [418 every case quoted by the opposite counsel, proceeds on the supposition that a suit was actually prosecuted, or an indictment or information actually pending when the composition of the offense was made.

AMES, on the same side.

By the COURT:

A father and son join in giving a promisory note, for the consid-

eration that the payee will abstain from prosecuting the son for a larceny, and will not appear in a court of justice as a witness against him.

The court are not called upon to decide whether an action may be supported upon a promise to pay for stolen goods, nor whether an action will lie to recover private damages sustained by the commission of a public offense. The only question presented by the record is, whether a court of justice will lend its aid to enforce a promise for the payment of money, the sole consideration of which is another promise, made by the plaintiff, to conceal or stifle the prosecution of a crime, perpetrated against the peace and common good of mankind.

The well-being, the existence of every government, obviously depends, in a great measure, upon the due execution of its criminal laws. Any contract, therefore, the consideration of which is to conceal a crime, or stifle a prosecution, is necessarily repugnant to public policy; and it is a settled rule of law that all contracts, whose consideration is contrary to public policy, are void. 2 Kent Com. 366; 2 Stark. Ev. 87.

It is unnecessary to inquire whether such contracts are positively prohibited by law, or whether it is, in all cases, the legal or moral duty of an individual, cognizant of the commission of a crime, to make a disclosure to the proper authorities. Admitting the existence of cases where silence would be excusable, it by no means follows that an express contract to conceal the offense, or smother its prosecution, must be sanctioned by the law, or enforced by the judicial tribunals of the country.

419] *The objection, that when the contract was made, no suit had been commenced, or indictment found, is without foundation. The same, if not stronger reasons of public policy, exist before as after the existence of a prosecution. By a public prosecution the offender becomes notorious, and the community are put upon their guard. By a composition of the felony, in secret, without any prosecution, the true character of the offender is unknown, and the community are subjected to depredations, which might otherwise be anticipated and prevented.

As between the parties to this action the defense may not be very honest; and we may adopt the language of Lord Mansfield, (Camp. 341), " that the objection that a contract is immoral or illegal, as between plaintiff and defendant, sounds at all times very

382·

ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded on general principles of policy, that *ex dolo malo non oritur actio.* No court will lend its aid to a man who founds his cause of action upon an *immoral* or *illegal* act."

Whenever an agreement appears to be illegal, immoral, or against public policy, a court of justice leaves the parties as it finds them; if the agreement be executed, the court will not rescind it; if executory, the court will not aid in its execution.

Judgment reversed. (*a*)

(*a*) Same principle, 4 Johns. 419; 12 Johns. 306; 19 Johns. 341; 3 Cowen, 213; 11 Johns. 388; 2 Wils. 341.